## In re Griffin

Before Gordon, P. J., Parry and Mawhinney, JJ.

*A. W. Thorington,* for Committee of Censors.

*J. M. Smith, Jr.,* for respondent.

PARRY, J., December 27, 1951.—The Committee of Censors of the Philadelphia Bar Association entered a rule on Norman J. Griffin to show cause why he should not be disbarred from practicing in the Courts of Common Pleas of Philadelphia County in pursuance of section 56 of the bylaws of the association, which provides that:

"It shall be the duty of the Committee of Censors to apply for the disbarment of any lawyer who has been convicted of crime and the conviction sustained."

The petition for the rule sets forth that Griffin, then a United States Commissioner for the Eastern District of Pennsylvania, was indicted, with others, for conspiracy to defraud the United States in the issuance of passports. He pleaded not guilty and was tried by a jury which rendered a verdict of guilty; that on January 24, 1949, a sentence of imprisonment for a year and six months was imposed and on February 9, 1950, the mandate of the United States Court of Appeals for the Third Circuit, affirming the judgment of the District Court for the Eastern District of Pennsylvania, was filed and thereafter on March 11, 1950, the district court denied Griffin's petition for reconsideration of the sentence of imprisonment.

In his answer respondent sets forth that the bylaws of the bar association do not provide for necessary disbarment but for discipline, as the circumstances may warrant; that the facts of the case do not warrant his disbarment and an opportunity to present the facts to the court should be afforded him which, as he was then confined to prison, he was unable to do; he therefore requested that a hearing upon the petition and answer be postponed until he was able to appear personally and call witnesses in his behalf. This indulgence was granted and, since his release from the Federal prison, two hearings have been had and his case has been fully presented by himself and his counsel.

It is argued in his behalf that he was improperly convicted; that the Government witnesses were unworthy of credence; that certain irregular actions which he admits performing were at most venial offenses; that the court can disbar only for moral turpitude; that the offenses do not amount to moral turpi-

tude and that in order to determine this question it is our duty to review the record in the district court, and in this connection we are referred to a case in another State (Matter of Kaufmann, 245 N. Y. 423), as persuasive.

As to this it is sufficient to say that the law of New York is unlike that of Pennsylvania, and the conditions which made it a duty of the Appellate Division of the Supreme Court of New York to inquire into proceedings in the Federal court are not present here. We need not decide whether we are concluded by the verdict of the jury as in order that the fullest consideration may be given to respondent's contentions we have perused the voluminous testimony taken at the trial, together with the remarks of the trial judge, and find nothing therein that is helpful to respondent.

Briefly, the record shows that certain Chinamen (who were indicted with Griffin and his codefendant Belcher, a deputy clerk in the district court) desired to obtain passports for Chinamen who wanted to travel outside of the United States and wished to reenter the country later. Applications for passports were made in their behalf which were filed with Belcher, whose duty it was to accept properly verified applications and forward them to the State Department in Washington. Each application filed was supported by two affidavits; one, purporting to be made by the applicant, set forth that he was born in San Francisco, Calif., prior to the earthquake and fire, in which the record of his birth was said to have been destroyed. The second affidavit, in lieu of the missing birth certificate, set forth that the applicant was, to the affiant's personal knowledge, born in San Francisco. These affidavits, to which Griffin affixed his jurat were obtained from him by one or another of the Chinese defendants, one of whom testified that he paid Griffin various sums of money ranging from $50 to $200 for

the affidavits. In certain cases the Chinese did not appear at all before Griffin and sometimes he executed the affidavits in blank; gave them to the go-between who subsequently had signatures affixed thereto, presented them to the deputy clerk, who accepted an honorarium for forwarding them to Washington.

One affidavit, purporting to have been prepared by Griffin's employe, one Leah Bowman, on May 20, 1942, went from Griffin through Belcher to Washington and was sent back because it was not signed by anybody. A corrected affidavit was then prepared in Griffin's office as if executed by Leah Bowman. She denied that she ever signed it and stated that she was not even in Griffin's employment on May 20, 1942, when she was represented as preparing the original affidavit. It was further shown that at the time she was a patient in St. Luke's Hospital, Philadelphia. At his trial Griffin did not deny these transactions but attempted to explain them on the ground of inadvertence, haste, presssure of business and the like. He did, however, deny accepting the bribes.

The exculpation attempted before us is, first, that the acts done by him were not done in his capacity as an attorney but as a United States commissioner and, therefore, such acts should not be considered in a petition charging that he had been guilty of nonprofessional conduct and should be disbarred from further practice. This we dismiss without discussion. Next we do not think that respondent's attacks on the credibility of the Government's witnesses deserve consideration by us. Their evidence was heard by a jury that accepted it and rejected respondent's denials.

With regard to the question of moral turpitude, no doubt there are improper acts performed by attorneys, for which the law requires disbarment, that may not come within a strict definition of moral turpitude

which is defined as baseness or depravity. But here we doubt that we are much concerned with nice distinctions or definitions and, in any case, we think respondent's actions do amount to baseness and depravity. Both a sworn officer of the court and a Government official, he took part, with others, in a series of transactions designed to defraud the Government by securing passports for persons who were not entitled to receive them and for his complaisance accepted bribes in substantial amounts. These transactions succeeded one another at frequent intervals for nearly two years, and, as the trial judge observed, are inconsistant with any possible inference except that of guilt.

If we understand respondent's position, he appears to think it a comparatively venial offense for anyone, who has taken an oath that qualifies him to administer oaths, to certify that someone has personally appeared before him and sworn to the truth of certain averments when that person has not appeared and so sworn; and it is asserted that notaries and commissioners often take a third person's word as to the signature on an affidavit. We do not think the fact, if it be one, that other officials violate their oaths of office will serve to excuse respondent for indulging in such a practice.

The fact is undeniable that respondent was a participant in a scheme to defraud the Government he was sworn to defend; a scheme that could not have succeeded without him. He denies guilty knowledge but apart from the findings of the jury, the inferences to be drawn from the circumstances are all against him.

The number of New York Chinamen all under the misfortune of losing their birth certificates in the San Francisco fire who preferred to undergo the trouble and expense of a journey to Philadelphia and return rather than make application in the District Court for the Southern District of New York where equal facili-

ties for obtaining passports exist, might well excite suspicion in the most unwary mind, but respondent not only made no inquiry but certified falsely in a number of cases that the affiants whom he never saw and of whom he knew nothing had appeared before him and complied with the requirements of the law. Haste, inadvertence or pressure of other business cannot be held to excuse or even palliate such a gross dereliction of duty.

Respondent has been convicted of a crime and the basis of his conviction was his unethical and dishonest practice of participating in a fraudulent scheme. He cannot even plead in extenuation sudden and overpowering temptation to relieve a pressing emergency, for the preparation of the plan involved some thought and time, and its execution was repeated over and over again for a period of nearly two years.

We have no jurisdiction to retry the issue of respondent's guilt. That has been finally determined by the proper tribunals, and we are solely concerned to ascertain whether his character conforms to the required standards. It appears to us that he has throughout displayed such a lack of moral perception as to demonstrate his unfitness for the practice of law and it is our duty to announce that under the evidence presented to us, he should be disbarred.

### Decree

And now, March 3, 1952, upon consideration of the rule taken by the Committee of Censors of the Bar Association of the County of Philadelphia, it is ordered that the rule be made absolute, and Norman J. Griffin be and is hereby disbarred from practice at the bar of this court and that his name be stricken from the roll of attorneys.

Notice of this order to be given by the prothonotary to the Supreme and Superior Courts of Pennsylvania,

the several Courts of Common Pleas, the Orphans' Court and the Municipal Court of Philadelphia County.

By the Court,

MAWHINNEY, J.

PARRY, J.

## DISSENTING OPINION

GORDON, JR., P. J., February 28, 1952.—I am unable to concur in the decision of the majority of the court disbarring respondent because of his conviction in the United States District Court for the Eastern District of Pennsylvania of "conspiracy to defraud the United States in the performance of its governmental function" of issuing passports.

As I read the testimony in that case from the record in the Federal court upon which respondent was convicted, I am convinced that his offending was more the act of an inexcusably credulous and careless official, than of one who deliberately and corruptly conspired with others to defraud the Government. His misconduct consisted in having, over a period of years, wrongfully affixed his signature as United States Commissioner to the jurats of affidavits as to the birth or citizenship of some 25 or 30 elderly Chinese citizens of this country, who were applying for passports for temporary visits to China, notwithstanding the affiants did not appear and actually take the oath before him. He did this at the solicitation of, and as an accommodation to, one John Lee, a Chinese whom he knew and trusted as a friend and client, and who represented to respondent that the infirmities of age made it difficult for the applicants to appear personally at his office. In some cases he signed the jurats in blank, and in others the affidavits were already filled out at the time he signed them.

It was neither charged in the indictment, nor contended by the Government at the trial, that the contents of the affidavits were false, or that passports would not have been granted to the applicants had the affidavits been properly sworn to before respondent. The only conspiratorial fraud charged against him was that by what he did, he induced the issuance of passports by the Government upon papers that purported to be, but were not in fact, lawfully executed affidavits —not that he conspired to procure passports for persons who he knew were not entitled to them. However deplorable, and even criminal, his offense may have been, it is but fair to respondent to note that it does not appear to have worked substantial public harm. Because of the dangers inherent in respondent's negligent performance of his duties as a public official, his misconduct may well have merited the direct and heavy penalty of 18 months' imprisonment meted out to him by the district court, a penalty which he has paid in full. Nevertheless, in deciding whether any further punishment in respect to his office of attorney of this court should be inflicted upon him, it is important to correctly and accurately appraise the true character of the offense which he committed.

That he was highly censurable for not having been more alert to the impropriety and dangers of such a reckless neglect of his duty in the manner in which he notarized the affidavits, I concede. At the same time, I do not agree that the evidence fairly supports the conclusion of the majority opinion that respondent was bribed by Lee to affix his official certification to them. The only evidence respecting his taking of bribes was given by Lee, who was also indicted with him, and who pleaded guilty and testified against him. Lee's testimony upon this subject, which respondent explicity denied, was to the effect that he made all such payments

privately to respondent and is wholly uncorroborated. Coming as this testimony does from the lips of the real ringleader in whatever frauds were perpetrated upon the United States Government, who pleaded guilty, and who acknowledged that he was testifying against respondent in the hope of benefitting himself by doing so, it is not believable. The uncorroborated word of such a man is worth nothing against that of a defendant who categorically denies the charge, and who was able to, and did, bring a host of witnesses to testify to his good reputation. Others may think differently, but I cannot give overbearing weight to such polluted testimony.

I do not defend respondent for relying upon the word of the man he trusted. Nevertheless, it was a very human and understandable fault, that is frequently committed, without any consciousnesss of moral delinquency, by innumerable notaries and others who administer oaths, and one which I fail to perceive any sound reason to condemn with an undiscriminating censoriousness. Wrong as his actions may have been, they do not, in my judgment, reveal moral turpitude. The only circumstance that would have imparted such a character to what he did, would have been satisfactory proof that he corruptly accepted money for his misconduct, and, as I have already pointed out, not a single witness testified to that effect, except the man who is a self-confessed conspirator, who, I believe, duped and betrayed his friend, and who later became a Government witness in the hope of lightening his own punishment.

In the light of the worst that was fairly shown against respondent, I see no justification for viewing his misconduct as in any true sense venal. Whatever may be said about the folly of his conduct, the credible evidence utterly fails to make him out a knave. He did not cheat or betray a client, or in anyway misconduct

himself as an attorney of this court, or even violate a law of this Commonwealth. This alone demands that the evidence upon which he was convicted in the Federal court be carefully scrutinized, in order to determine the true nature and extent of his offending against the fundamental moralities. Surely, we are not required, as the majority opinion seems to imply, to blindly accept respondent's conviction as sacrosanct and beyond question, or to assume that the jury that convicted him based its verdict upon a finding that every derogatory fact testified to by the witnesses against him was true. It is our duty to weigh and analyze the evidence offered against him, and to form our own independent judgment, with due respect to the verdict and judgment of the Federal court, of the nature and quality of his guilt, and its relation to his fitness to continue the practice of his profession.

Viewed in this way, I believe he deserves neither the oppressively severe penalty of disbarment, nor the disciplinary remedy of suspension from practice. With the imprisonment he has undergone, he has already received heavy and adequate correctional punishment for what he did, and, as he has not practiced his profession since he began serving his sentence, he has suffered the equivalent of a suspension from practice for almost two years. To now disbar him from a profession in which he has built up over the years an unblemished reputation for integrity, whose rules of behaviour he appears never to have violated, and whose honor he has never besmirched, would, in my judgment, be unjust and utterly disproportionate to the gravity of his misconduct.

I have long felt that the courts too often apply the supreme penalty of professional death without fully realizing its dreadful consequences. The attorney who, in his youth, has studied and prepared himself for his high calling, who through a long life has conducted

himself with due decorum and propriety, and who makes the mistake of misjudging the extent and character of his powers as a public official, in matters as to which he is not performing the duties of an attorney of any court, should never be condemned to a life of personal and economic degradation and penury, unless his acts disclose a moral obliquity and unfitness that make the ultimate penalty inescapable.

The truth is that disbarment, as a correctional measure, is savage and illogical. The avenues to prosperity for himself and his family are almost completely closed to the disbarred attorney. The blight of his condemnation by the court remorselessly pursues him. Positions of trust and confidence are closed to him; the activities for which his special training and talents fit him are no longer available. Few will trust him, and a suspicious world will shrink from employing him. Thus, he and his are condemned to the dreary life of the unskilled worker, in which he is constantly driven to deception to conceal his shame, in order that he may earn a modest living. Disbarment should be reserved for those attorneys whose misconduct reveals a fundamental moral unfitness for continued public trust and confidence. It is not, and should never be employed as a disciplinary measure for the erring, but solely as a means of protecting the public in its dealings with the members of the profession. This being its true function, disbarments that are later converted into suspension by reinstatement, as has heretofore so frequently occurred, are to be deplored.

We, as judges, should be more alert to the significance and consequences of our actions, when administering discipline to a member of our bar. In some instances, the crushing penalty of disbarment is doubtless necessary to protect the public from the unscrupulous individual, but they are far fewer than those in which it has been heretofore applied. In our very na-

tural and proper zeal to uphold the honor of the profession, we sometimes become unduly critical, and disbar when we ought only to discipline; and in the present case, I cannot bring myself to agree with my learned brethren, for whose wisdom and judgment I have the highest respect, that this respondent has evinced a lack of moral fibre that requires his disbarment.

I would, therefore, dismiss the petition of the bar association to further discipline respondent since he has already suffered as much corrective punishment as he deserves for his wrongdoing, and his acts, culpable as they may have been, do not merit the penalty that a majority of the court has decided to inflict upon him.